394 F.2d 381
 Morris SMITH and David Wiener, Applicants-Appellants,
v.
ALLEGHANY CORPORATION, Plaintiff-Appellee, Allan P. Kirby, Jr. and Fred M. Kirby II as Guardians of the Property of Allan P. Kirby, Fred M. Kirby and Charles T. Ireland, Jr., Defendants-Appellees.
Morris SMITH and David Wiener, individually and on their own behalf and that of all other shareholders of Alleghany Corporation similarly situated and derivatively on behalf of Alleghany Corporation, Plaintiffs-Appellants,
v.
Robert J. FITZSIMMONS, Allan P. Kirby, Jr. and Fred M. Kirby II as Guardians of the Property of Allan P. Kirby, and Alleghany Corporation, Defendants-Appellees.
ALLEGHANY CORPORATION, Plaintiff-Appellant,
v.
Allan P. KIRBY, Jr. and Fred M. Kirby II as Guardians of the Property of Allan P. Kirby, Charles T. Ireland, Jr. and Fred M. Kirby, Defendants-Appellees.
 No. 152.
 No. 153.
 Docket 31115.
 Docket 31342.
 Docket 28397.
 United States Court of Appeals Second Circuit.
 Argued February 20, 1968.
 Decided May 8, 1968.
 
 Robert L. Bobrick, New York City, for applicants-appellants Smith and Wiener.
 Randolph Phillips, pro se.
 John E. Tobin, New York City (Granville Whittlesey, Jr., Peter J. Gartland, Benjamin Vinar, and Donovan, Leisure, Newton & Irvine, New York City, on the brief), for defendants-appellees Kirby and Ireland, Jr.
 Vincent R. Fitzpatrick, New York City (Anthony F. Phillips, and Willkie, Farr, Gallagher, Walton & FitzGibbon, New York City, on the brief), for Alleghany Corp.
 Samuel N. Greenspoon, New York City (Pollack, Greenspoon & Singer, New York City, on the brief), for defendant-appellee, Fitzsimmons.
 Before FRIENDLY and SMITH, Circuit Judges, and GIGNOUX, District Judge.*
 J. JOSEPH SMITH, Circuit Judge:
 
 
 1
 We have considered together an appeal in No. 31115, Smith et al. v. Alleghany et al., an appeal in No. 31342, Smith et al. v. Fitzsimmons et al., and motions to set aside the judgment in No. 28397, Alleghany v. Kirby, entitled as motions under Rule 19(c). We find no error on the appeals and affirm in both cases. We deny the motions.
 
 
 2
 Nos. 31115 ("Smith v. Alleghany") and 31342 ("Smith v. Fitzsimmons"), and the motion in No. 28397 ("Alleghany v. Kirby"), are attempts to revive the litigation which grew out of a 1949-50 self-dealing transaction by four of the directors of Alleghany Corporation ("Alleghany").
 
 
 3
 In 1949, Alleghany acquired 85% of the voting stock, and 48,000 shares of "class A" common stock, of Investors Diversified Services (IDS), a highly leveraged investment company (and investment advisor to a large mutual fund complex). In December 1949, it was resolved at a meeting of Alleghany's board of directors that Alleghany offer to its officer-directors the opportunity to acquire "class A" IDS stock in exchange for Alleghany preferred stock. After shareholder approval, Alleghany on May 15, 1950 transferred 48,125 shares of IDS "class A" common to Allan P. Kirby and Robert R. Young (president and chairman of the board, respectively, and both directors) in exchange for 4,840 shares of Alleghany preferred. The IDS stock was transferred at a price of $8.1453 a share, and by 1954 its price had advanced to about $200.00 a share.
 
 
 4
 Numerous derivative actions, based upon the alleged illegality of the above transaction, as well as alleged irregularities in other transactions, were brought on behalf of Alleghany against various of its officers and directors (including Kirby, Young, and Clint W. Murchison, Jr. and John D. Murchison) in 1954. Ten such actions were consolidated in the New York courts under the title of Zenn v. Anzalone ("Zenn"). Ten more were consolidated in United States District Court (Southern District of New York) under the same title. [The latter action, according to the affidavit of Benjamin Vinar (Donovan, Leisure, Newton & Irvine), was dismissed for lack of prosecution on August 9, 1966. See Appendix for Kirbys in No. 31342, p. 41A.] Although Kirby was made a defendant in both actions, he was served only in the federal one.
 
 
 5
 Another derivative action on behalf of Alleghany, entitled Breswick v. Briggs, 135 F.Supp. 397, was commenced in United States District Court (Southern District of New York) on February 14, 1955. Randolph Phillips was retained as a consultant to the plaintiffs' attorney in the Breswick action.
 
 
 6
 Negotiations between Abraham L. Pomerantz (attorney for the plaintiffs in both the state and federal Zenn actions) and representatives of the defendant officers and directors resulted in April 1955 in a tentative settlement of all claims asserted in any pending derivative action involving Alleghany. The consideration was to be $700,000 cash paid by the defendants to Alleghany, plus the revision in favor of Alleghany of certain loss guarantees issued by the Murchisons in connection with certain joint ventures.
 
 
 7
 Upon application by Alleghany in the New York Supreme Court for approval of the settlement, that court appointed Robert J. Fitzsimmons as Referee, directing him to inquire into the "fairness, reasonableness and adequacy" of the stipulation of settlement. Notice of the terms of the proposed settlement was mailed to all Alleghany stockholders, and one Samuel R. Rosen, a stockholder represented by the law firm of Graubard & Moskovitz, appeared as an objectant to the settlement. Randolph Phillips served as a consultant to Graubard, and worked with him and Rosen in opposing the settlement in hearings which commenced before Fitzsimmons on September 19, 1955 and continued until January 1956. Kirby was excused from appearing at those hearings by Fitzsimmons. (A doctor testified that appearing would endanger Kirby's life.)
 
 
 8
 Meanwhile, the attorneys in the Breswick action, asserting that their exclusion from the Zenn settlement negotiations had been unfair, brought a proceeding in United States District Court to enjoin the defendants in Breswick from interposing in that action "any defense based upon any judgment entered in any action other than this action pursuant to any agreement not negotiated with the [Breswick] plaintiffs or their attorneys." An injunction was granted, by order dated October 27, 1955.
 
 
 9
 At the conclusion of the hearings before Fitzsimmons, the Breswick defendants moved to vacate the injunction in their case, and after argument of the motion, Judge Walsh of the United States District Court suggested that settlement of the entire litigation be discussed between plaintiffs and the defendants, who included Kirby. Negotiations followed, and led to an increase over the offer made in Zenn. But the Breswick plaintiffs still were not satisfied, and when the defendants again moved to vacate the injunction, the United States District Court appointed Fitzsimmons as Special Master to hear and report on the good faith of the Breswick settlement proposal. These hearings were held in October and November, 1956. Fitzsimmons submitted a report to the United States District Court on November 17, 1958 recommending that the injunctive order be vacated. On the same day he submitted a report to the New York Supreme Court recommending that the original stipulation of settlement in Zenn, as augmented by the additional settlement, be approved. (By the terms of the settlement as it stood at that time, defendants were to pay $1,000,000 cash to Alleghany; the loss guarantee was to be amended; and a transaction in which the Murchison brothers had obtained 130,000 shares of IDS voting common was to be reversed.)
 
 
 10
 The matter of confirming the reports was argued in both the state and federal courts. The objectant stockholder Rosen, in Zenn presented three basic points relating to the 1949-1950 IDS transaction, all of which had, of course, also been presented to Fitzsimmons as Referee: (1) Kirby and Young, it was alleged, had possessed inside knowledge that the earnings of IDS would increase approximately 500% in 1950 alone; (2) the December 1949 directors' meeting was allegedly illegal; and (3) the directors had allegedly failed to disclose material facts, etc. to the stockholders in the proxy statement for the meeting at which the exchange was ratified.
 
 
 11
 Justice McGivern of the New York Supreme Court approved the settlement as recommended by Fitzsimmons on March 9, 1959. Zenn v. Anzalone, 17 Misc.2d 897, 191 N.Y.S.2d 840. He noted that "this court is the beneficiary of a lucid, painstaking and comprehensive report of a Referee achieved after protracted hearings which more nearly resembled a trial on the merits than on the adequacy of the proposed settlement. * * * The Referee has concluded that * * * the amended offer of settlement constitutes a fair, reasonable and adequate basis for a settlement of this litigation * * *." 191 N.Y.S.2d at 843-844. Justice McGivern stated, however, that no order could be entered upon his decision until after action by the United States District Court on the motion to vacate the injunction.
 
 
 12
 Judge Dimock of the United States District Court took a somewhat less favorable view of the suggested settlement; on September 22, 1959 he rejected Fitzsimmons' report as Special Master and referred the matter back to him for further hearings. Phillips, who had a hand in both the Zenn and Breswick actions, realized that Judge Dimock's order improved the plaintiffs' position considerably. He therefore got in touch with Charles T. Ireland, Jr., an attorney representing Alleghany and Kirby, and advised him that new hearings would now be held at which Kirby would have to testify. [Young had died on January 25, 1958, and Kirby had then become Chief Executive Officer and Chairman of the Board of Alleghany.] At the time, one Mr. Daly (of Lord, Day & Lord) was representing Alleghany and Kirby and the other defendants; Daly and Mr. Adams, who represented the Murchisons, were opposed to allowing Phillips to participate in the settlement discussions. Daly preferred to deal with Pomerantz, with whom the original $700,000 settlement had been worked out, but Graubard (who represented stockholder Rosen) objected to that. Daly apparently thought that further hearings should be held, and that Kirby should testify. Meanwhile, dissension grew in the plaintiffs' ranks. Phillips managed to keep the pressure on Kirby, however, and Kirby inquired of Daly what his maximum liability might be. Daly's response, dated October 22, 1959, indicated that liability in connection with the IDS exchange transaction might cost Kirby $22,800,000, or, if he were held jointly liable, $39,350,000. Kirby then authorized Ireland to negotiate settlement terms with Phillips. [It is interesting to note, however, that Phillips' extra leverage was obtained by the federal court's refusal to approve the Special Master's report in the Breswick litigation, which did not involve the IDS exchange transaction.]
 
 
 13
 During the final settlement negotiations, in late 1959, Kirby decided to change attorneys (apparently as a result of Daly's failure to advise him as to whether he could settle individually). The firm of Donovan, Leisure, Newton and Irvine was substituted for Lord, Day & Lord, with the understanding that they would try to work out a settlement of Kirby's individual liability by the end of the year.
 
 
 14
 Intensive negotiations on December 19 and 20, 1959, produced a final settlement, under which Kirby agreed to make a payment of $1,100,000 in addition to his obligation under the $1,000,000 basic settlement earlier arrived at. On December 24, Judge Dimock was advised that the Young estate was willing to contribute an additional $900,000 to the basic settlement; accordingly, the Breswick plaintiffs agreed to the vacating of the 1955 injunction. The effect of the final settlement was that Alleghany would receive $3,000,000 from the various defendants, and that control of IDS would be returned to Alleghany from the Murchisons. The settlement was approved by the New York Supreme Court on December 28 and 29; between those dates and May 1960, Alleghany issued releases to the defendants. A judgment dismissing the action on the merits as to all parties was entered in New York Supreme Court on June 21, 1960.
 
 
 15
 The order entered by Justice McGivern on December 29, 1959, approving the final settlement, provided that Fitzsimmons might apply to the New York Supreme Court for an allowance for his services both as Referee in that court and as Special Master in the United States District Court. Prior to making his fee application, Fitzsimmons spoke with Judge Dimock about the allowance for his services, and was told that he would not be required to proceed in the United States District Court with reference to fees for his services as Special Master. Fitzsimmons made application to the New York Supreme Court on May 16, 1960, for $150,000 compensation for his services as Referee and Special Master. In his affidavit submitted with the application, Fitzsimmons referred both to the amount of effort expended by him and to "the value of the ultimate settlement" in arriving at the $150,000 figure. The only party to the settlement which objected to that figure was Alleghany; Ireland, acting as its attorney submitted a memorandum in which he pointed out that: "Applicant's compensation for services rendered as Referee and Special Master could in no wise depend upon the value of the recovery for the corporation; the Applicant would be entitled to compensation for his services had there been no recovery whatever for the corporation." The memorandum suggested that appropriate compensation for the maximum estimate of Fitzsimmons' time would be $115,000. Fitzsimmons subsequently met with Ireland at the latter's office, and suggested that Alleghany file an affidavit with the court indicating what it considered the value of the services to be. Justice McGivern, by order dated June 10, 1960, fixed the fee at $125,000; it appears that before doing so he communicated with Alleghany and was advised by counsel that the sum would be acceptable.
 
 
 16
 We next come to what has been termed by Judge Friendly the "Willheim chapter" of the Alleghany Corporation — that chapter which takes us "through the proxy contest resulting in the victory of the Murchison brothers over Allan P. Kirby at the annual meeting of the stockholders of Alleghany Corporation in May 1961." See Phillips v. S. E. C., 388 F.2d 964 (2 Cir. slip opinion 1007, 1008, January 16, 1968). Simultaneously with the commencement of that proxy contest, the Murchisons, on September 8, 1960, brought a derivative action in the United States District Court for the Southern District of New York against Kirby, Phillips, Ireland, and six other defendants. The suit was brought on behalf of Alleghany, which was named as a nominal defendant. [After the Murchisons' victory in the proxy fight, Alleghany was substituted as party plaintiff, and the action was dismissed as to all defendants other than Kirby, Phillips, Ireland and Fred M. Kirby.]
 
 
 17
 The gravamen of the complaint, as amended, was in the allegation that there had been fraud in the obtaining of the settlements (and in the obtaining of the United States District Court order vacating the 1955 injunction in Breswick). The complaint focused upon Kirby, seeking inter alia the following relief: (1) That the December 24, 1959 stipulation of settlement in Zenn, and the December 24, order vacating the injunction in Breswick and approving a separate Kirby settlement in Breswick, be declared null and void (or, in the alternative, that Kirby be enjoined from pleading the orders, etc. as res judicata); (2) That the order of the New York Supreme Court in Zenn approving a separate Kirby settlement be declared null and void (or that Kirby be enjoined from pleading it as res judicata); (3) (similar relief as to the judgments of the New York Supreme Court dismissing the complaint); (4) That all releases on behalf of Alleghany delivered to Kirby in Breswick or Zenn be rescinded; (5) That the 1949-50 transaction be rescinded, or that damages measured by the value of a rescission be awarded.
 
 
 18
 The essential allegations of fraud were: (1) a corrupt agreement whereby Kirby was enabled to settle for far less than he should have had to pay, and from which Phillips and Ireland personally benefited; and (2) failure by Kirby to adduce or cause to be adduced before the New York Supreme Court or the United States District Court, or before Fitzsimmons as Referee and Special Master, facts material to an evaluation of Kirby's liability on claims arising out of the 1949-50 IDS stock transaction and of the fairness of the settlements proposed.
 
 
 19
 The District Court, Judge Dawson, held that there was diversity of citizenship, and that given diversity the court had jurisdiction over an independent action to prevent Kirby from claiming the benefits of the settlement, citing Marshall v. Holmes, 141 U.S. 589, 12 S.Ct. 62, 35 L.Ed. 870 (1891).[1] Judge Dawson then found that it had not been established that there was a secret agreement made by Phillips for his own benefit, and that it had not been shown that Kirby had committed a fraud upon the State court or its Referee in failing to produce certain documents at the hearings. Alleghany Corporation v. Kirby, 218 F.Supp. 164 (S.D.N.Y.1963).
 
 
 20
 Appeal by Alleghany to this court was limited to the claim that Kirby should have disclosed certain facts during the settlement negotiations. The judgment of the District Court was affirmed, Alleghany Corporation v. Kirby, 333 F.2d 327 (2 Cir. 1964). Judge Moore's opinion for the court was based in part on the principle that a director, defendant in a derivative suit, is not bound to disclose on his own initiative everything which might be relevant, and in part on the holding that evidence, in order to justify setting aside a settlement, ought to be at least of the character required for a new trial. Judge Friendly, in dissent, argued that the usual fiduciary obligation of a director should continue in a situation where he is charged with self-dealing. He also pointed out that even though personal dereliction by Kirby might not have been shown, Kirby, Young and Purcell were in a "joint venture" of sorts, and it appeared that Young and Purcell (who both testified at the hearings) had permitted the Referee to pass upon the settlement when they should have been aware that crucial and damaging evidence was not before him. (The evidence tending to show this had been excluded by Judge Dawson.) The evidence not before the Referee consisted of schedules of projected IDS income; the evidence excluded by Judge Dawson consisted of a note from Purcell to Young indicating that the projections were probably seen by the Alleghany directors. If the projections were seen by them, that would diminish the strength of the directors' principal arguments in defense to the Zenn actions: that they hadn't known IDS earnings would increase so dramatically.
 
 
 21
 [Two days after oral argument to the three-judge panel, the Kirby group regained control of Alleghany.]
 
 
 22
 After the panel decision, Stuart N. Updike, who had been representing Alleghany wrote a letter to Chief Judge Lumbard asking guidance with respect to his firm's responsibility to Alleghany and its minority stockholders in view of the fact that Kirby had regained control of the corporation. [He also called the court's attention to the case of South Spring Hill Gold Min. Co. v. Amador Medean Gold Min. Co., 145 U.S. 300, 12 S.Ct. 921, 36 L.Ed. 712 (1892) — referred to further below.] Subsequently Updike appeared before the Alleghany Board of Directors and answered questions about the case, whereupon the Board authorized the firm to take whatever steps were necessary to apply for a rehearing of the panel decision, with the suggestion that the case be heard in banc. The case was heard in banc, and this court split four-four, the result being affirmance of the District Court judgment. Alleghany Corporation v. Kirby, 340 F.2d 311 (2 Cir. 1965).
 
 
 23
 Subsequent to the in banc decision, the Alleghany Board consulted both the Updike firm and Willkie, Farr, Gallagher, Walton & FitzGibbon (who are still representing Alleghany — at least in these actions) with respect to the advisability of petitioning the Supreme Court for a writ of certiorari, and with respect to the directors' responsibility toward the shareholders in making that decision. The "independent" Board members voted unanimously not to authorize a petition for a writ of certiorari. As might be expected, Alleghany shareholders (Holt and McMahon) then applied to the United States District Court for leave to intervene as a matter of right for purposes of carrying the litigation to the Supreme Court. Their application was denied by Chief Judge Ryan, who noted among other things that they had watched the litigation closely from the outset but sought to intervene only on the eve of the deadline for filing a petition for a writ of certiorari. His action was affirmed by this court, Judge Hays dissenting on the ground that the Alleghany Board was probably under the influence of Kirby when it decided not to authorize a petition to the Supreme Court. Alleghany Corporation v. Kirby, 344 F.2d 571 (2 Cir. 1965).
 
 
 24
 At this point the Supreme Court, perhaps not fully aware of what it was getting into, on petition of Holt and McMahon issued writs of certiorari to review both the decision on the merits and the decision denying Holt and McMahon the right to intervene. After oral argument, the writs were dismissed as improvidently granted sub nom. Holt v. Kirby, 384 U.S. 28, 86 S.Ct. 1250, 16 L.Ed.2d 335 (1966). Mr. Justice Black dissented, stating that he would reverse the judgments substantially for the reasons stated in Judge Friendly's dissent; Mr. Justice Harlan and Mr. Justice White dissented, believing that the cases should be adjudicated on the merits. It may be a good guess that the writs were dismissed on the theory that since the state court judgment was based entirely on the common law (cf. 340 F.2d 311, 312, n. 1), and the Breswick action in the federal court did not involve the IDS transaction, there were no federal issues in the case.
 
 
 25
 The foregoing summarization of the Zenn, Breswick, and Alleghany litigation brings us to the litigation now before the court.
 
 
 No. 31115 Smith et al. v. Alleghany Corporation et al.
 
 
 26
 Judge Kaufman said, with respect to the application of Holt and McMahon to intervene in Alleghany v. Kirby, "The aspect of [Alleghany's] litigious history presently before us * * * may occupy no more than a footnote when the definitive chronicle is written * * *." 344 F.2d at 572. This case is, in a sense, a footnote to a footnote.
 
 
 27
 Smith, et al. moved in the United States District Court for the Southern District of New York to intervene in Alleghany Corporation v. Kirby and to void the judgment entered, principally on the ground that the resumption of corporate control by Kirby two days after oral argument before the three-judge panel of this court foreclosed any justiciable controversy between parties having adverse legal interest. Heavy reliance was placed upon South Spring Hill Gold Min. Co. v. Amador Medean Gold Min. Co., 145 U.S. 300, 12 S.Ct. 921, 36 L.Ed. 712 (1892), in which the Supreme Court, being advised that before argument control of both parties (corporations both) to the suit had come into the hands of the same persons, remanded the case without passing on the merits. Judge Weinfeld, noting that this court had had notice that control over the corporation had shifted, and that the South Spring case had been specifically called to the court's attention, denied the application.
 
 
 28
 Two points are made on the appeal.[2] The first contention is that the District Court lacked jurisdiction to consider the motion which appellants brought before it (under Rule 60(b)) without obtaining leave from this court, which had affirmed the judgment. A motion to vacate Judge Weinfeld's decision for want of jurisdiction was denied below. It is the rule in most circuits that where the action which the district court is asked to take under Rule 60(b) would disturb the judgment ordered by the appellate court's mandate, the district court lacks power to proceed until leave is obtained. 7 Moore, Federal Practice ¶ 60.30 [2]. This court has not yet decided whether the rule should be established in this circuit — Judge Clark was very strongly of the view that it should not. See generally Judge Friendly's opinion in Schildhaus v. Moe, 335 F.2d 529, 530 (2 Cir. 1964). We need not resolve the question here in view of our determination on the merits.
 
 
 29
 Appellants' second point goes to the merits — it is that this court lost jurisdiction of Alleghany v. Kirby when the Kirby forces regained control of Alleghany, because there was no longer a justiciable controversy. However, the case heavily relied upon by appellants — South Spring, supra — involved a situation where the corporate litigants had both come under control of the same persons before oral argument, and it seemed clear that the controlling persons were, in effect, asking the Supreme Court for advice on how certain minority interests should be treated. Here, the situation was very different, for Alleghany Corporation v. Kirby was vigorously argued to this court by attorneys clearly representing adverse parties, and the Kirby takeover had no effect on the posture of the case as it was submitted to the court for decision. The only effect the takeover might have had would be on the submission on the reconsideration in banc, and on the decision not to seek review on certiorari. Be that as it may, the three-judge panel had jurisdiction, at least. Moreover, this court's determination, implicit in its decision, that there was a justiciable controversy is res judicata, and not open to collateral attack. Swift & Company v. United States, 276 U.S. 311, 326, 48 S.Ct. 311, 72 L.Ed. 587 (1928). Cf. Chicot County Drainage District v. Baxter State Bank, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940). Appellants contend that there was no adjudication of the constitutional "justiciable controversy" issue because the issue was not brought specifically to this court's attention. But the issue might have been raised, and that is what is crucial. See Chicot County Drainage District v. Baxter State Bank, supra. The failure to seek certiorari, suspect though it may be (see Judge Hays' dissent in 344 F.2d at 575), was cured by the Court's grant of certiorari on the application of the intervenors. There is no indication that the later dismissal of certiorari was on the ground that procedurally the case was not properly before the Court. The ruling of Judge Weinfeld that the determination was not open to collateral attack was correct.[3]
 
 
 No. 31342 Smith et al. v. Fitzsimmons et al.
 
 
 30
 This is an appeal from a judgment in the District Court, Judge Bonsal, denying plaintiff-appellants' motion for summary judgment on the first count of their complaint, and granting defendants' motions for summary judgment. Smith v. Fitzsimmons, 264 F.Supp. 728 (S.D. N.Y.1967).
 
 
 31
 Appellees raise the question of federal jurisdiction in the absence of complete diversity, two of the plaintiffs and Fitzsimmons being citizens of New York and there being no allegation that Alleghany does not have its principal place of business in New York. However, the second and third counts, attacking the judgments in federal court actions, may be rested on ancillary jurisdiction, 7 Moore Federal Practice ¶ 60.38, and the fourth, purportedly based on federal statutes, does not require diversity. The first count of the complaint seems to seek recovery only for the diverse plaintiff and we have no doubt that the district court would have permitted dismissal of this count as to the New York plaintiffs and if necessary a severance if sought. Moreover, the state law claim may well be retained even in the absence of diversity as pendent to the second and third claims arising out of the same operative facts. Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 319, 77 L.Ed. 972 (1933); United Mine Workers of America v. Gibbs, 383 U.S. 715, 722-725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). We decline therefore to order dismissal of the first count at this stage for formal defect in allegations of diversity of the parties.
 
 
 32
 The first count of the complaint alleges that Fitzsimmons obtained his "compensation" for his services in Breswick in violation of Federal Rule 53(a), since he applied to the New York Supreme Court for compensation whereas Rule 53 (a) provides: "The compensation to be allowed to a master shall be fixed by the court * * *." (meaning, presumably, the U. S. District Court). It is also alleged that the fee application was made while the Zenn orders were on appeal, by "collusion with Alleghany and Kirby," that Alleghany was improperly represented upon the fee application, and that Fitzsimmons made secret communications to Ireland (who acted as Alleghany's attorney on the fee application) in order to obtain the sum of $125,000 awarded as his fee for acting as Referee in Zenn and Special Master in Breswick.
 
 
 33
 The second count realleges count one and further alleges that Fitzsimmons violated § 14 of the New York Judiciary Law, McKinney's Consol.Laws, c. 30, in that he was "interested" in the matters at issue in Zenn and Breswick, and that Kirby's counsel wrote Fitzsimmons' Referee's report. (Excerpts from this court's decision in Alleghany — chiefly from Judge Friendly's dissent — are alleged to "show" that Fitzsimmons did not adequately discharge his duties as Referee insofar as the IDS transaction was concerned.)
 
 
 34
 The third count realleges the first two, and alleges Fitzsimmons' "hidden interest" in the outcome of Zenn — an openly avowed interest, plaintiffs claim. This is no different from count two, except that it alleges a conspiracy among Fitzsimmons, Kirby and Alleghany. The fourth count alleges that all of the acts alleged in the prior counts constituted a conspiracy to deprive plaintiffs and all "absent shareholders" in Zenn of their rights under the 14th Amendment and 42 U.S.C. §§ 1983, 1985(2) and 1985(3) (the Reconstruction Civil Rights Acts). This last bizarre claim requires no discussion.
 
 
 35
 Appellants requested the following relief: (1) that Fitzsimmons be directed to repay to Alleghany $125,000, with interest; (2) that the 1950 IDS transaction be rescinded (or damages be assessed against Kirby, measured by the value of a rescission); (3) that the orders and releases of the New York Supreme Court in Zenn relating to Kirby and the IDS transaction be declared null and void; (4) that a judgment issue declaring that this court's judgment in Alleghany v. Kirby, and the District Court's judgment as it related to the IDS transaction, were procured by fraud and are null and void; (5) that Kirby be prohibited from participating as a stockholder in any recovery; (6) that an order issue declaring the continued existence of Alleghany to be against the interest of the public, the plaintiffs, and the minority stockholders; and (7) that Alleghany be dissolved.
 
 
 36
 So far as we can determine, in all this, appellants advance four basic claims: (1) it was improper for the state court to determine Fitzsimmons' fee for his services as Special Master rendered the U. S. District Court; (2) Fitzsimmons had a "hidden interest" in the outcome of Zenn; (3) there was collusion among Fitzsimmons, Alleghany and Kirby in the setting of Fitzsimmons' fee; and (4) Kirby's counsel wrote Fitzsimmons' report as Referee in Zenn.
 
 
 37
 (1) It appears that Judge Dimock intended that the New York Supreme Court take Fitzsimmons' services as Special Master into account in setting his overall fee, and that Fitzsimmons need not submit the fee to the federal court for consideration. Even in the peculiar circumstances of the interrelated Zenn and Breswick litigation, this would appear to be improper. Rule 53 (a) F.R.Civ.P., provides: "* * * The compensation to be allowed to a master shall be fixed by the court, and shall be charged upon such of the parties or paid out of any fund or subject matter of the action, which is in the custody and control of the court as the court may direct * * *" See also 5 Moore, Federal Practice, ¶ 53.04(3) (2d ed. 1967).
 
 
 38
 The impropriety of letting the state court set the Special Master's fee is highlighted by the fact that Fitzsimmons' fee was paid entirely by Alleghany — the state court could not have required Kirby to pay any part of the fee, for Kirby had never been effectively made a party to the state litigation. (It appears to be assumed, however, that it was agreed among all of the parties that Alleghany should pay the fees.)
 
 
 39
 That the procedure by which Fitzsimmons' fee was set may have been improper does not mean, of course, that appellants can succeed now in obtaining any part of the fee back for Alleghany. Since the matter of Fitzsimmons' fee was submitted to the state court, and the parties in Zenn were free to object to the amount and to raise any issues pertaining to the fee award, the matter is now closed under the principle of res judicata. Appellants' reliance on Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940) is misplaced, for the holding there was that where members of a purported class have potentially conflicting interests and are free either to challenge the alleged rights or to assert them, a judgment in a suit brought by some members of the class will not be res judicata on the existence of those rights as to those class members not made parties to the litigation. The situation here, involving a stockholders' derivative suit, is very different, and is controlled by the rule that where the notice and representation are adequate a settlement decree in a derivative suit — a true class action — is res judicata. Stella v. Kaiser, 218 F.2d 64, 65 (2 Cir. 1954) (dictum), cert. denied 350 U.S. 835, 76 S.Ct. 71, 100 L.Ed. 745 (1955). See also 3A Moore, Federal Practice, ¶ 23.11 (2d ed. 1967).
 
 
 40
 Appellants contend that since the error in allowing the state court to fix the fee can be characterized as lack of jurisdiction in the state court to take such an action, and the lack of jurisdiction was not raised as an issue in Zenn, res judicata is no bar. There is no question, however, but that the state court had jurisdiction of the subject matter and the parties in Zenn; moreover, this court has said that "With few exceptions a collateral attack upon the subject-matter jurisdiction of a court in which both parties have appeared is prohibited notwithstanding the failure of the parties to litigate the issue." United States v. Eastport Steamship Corporation, 255 F.2d 795, 803 (2 Cir. 1958). Certainly a collateral attack on jurisdiction to set a master's fee should be even less favored than such an attack on jurisdiction over the subject matter of the litigation.
 
 
 41
 (2) Assuming that if Fitzsimmons had a "hidden interest" in Zenn, that would have violated Section 14 of the New York Judiciary Law (McKinney's Consol.Laws, c. 30) and would permit a collateral attack at this time both on the Zenn judgment and on the fee award, appellants' problem is that they offered no evidence in the District Court to show such a "hidden interest." A theory is offered that Fitzsimmons knew that if he rejected the settlement, the amount of compensation he wanted would have been opposed by Alleghany under the control of Kirby. However, no evidence was offered to support this theory. So far as this point is concerned, then, summary judgment for the defendants was proper.
 
 
 42
 It may not be entirely clear from Judge Bonsal's opinion whether he was granting summary judgment under Rule 56 or dismissing the complaint under Rule 12. (There were motions under both rules.) As to the attack on Fitzsimmons' fee, it seems clear that there was a dismissal of the complaint, and this was certainly proper, since the issue was res judicata after the Zenn judgment. The problem arises with respect to allegations of Fitzsimmons' hidden interest, etc. Here the judge apparently ruled under Rule 56 and the judgment as to these allegations must be upheld under the Rule, since it appears that the parties had the opportunity to and did submit affidavits on the issues.
 
 
 43
 (3) The issue of "collusion" among Fitzsimmons, Kirby and Alleghany in the setting of Fitzsimmons' fee might not be res judicata before Judge Bonsal insofar as the allegations made by appellants differ from the grounds for attacking the fee already discussed under (1) supra, since Fitzsimmons was not a party in Alleghany v. Kirby. And the "collusion" theory, if supported by evidence, would at least raise the possibility not only of attacking the fee but also of attacking the Zenn judgment.
 
 
 44
 The allegations under the "collusion" theory center on the events of May and June 1960, surrounding the Fitzsimmons fee application. They are: (a) the fee application was filed before the rights of the litigants were finally determined; (b) Fitzsimmons selected Alleghany to pay his fee; (c) Fitzsimmons' visit to Ireland's office regarding the fee application was improper; and (d) the attorneys representing Alleghany on the fee application (the memorandum opposing the initial application was written by members of the Donovan firm, it is alleged) had a conflict of interest, in that they were Kirby's lawyers and thus were discouraged from contending that Kirby should pay part of Fitzsimmons' fee.
 
 
 45
 The problem with this theory, again, is the almost total absence of supporting evidence.
 
 
 46
 Substantiation of allegation c, relating to Fitzsimmons' visit to Ireland, might give color to the collusion theory, especially in light of a, b, and d. The claim seems to be that the visit was for the purpose of bargaining over the fee amount. Apparently recognizing that there was no evidence before the District Court on this point, appellants contend that the facts are shown in the record on what they characterize as "the Rule 19(c) application." But that record is not in this case, and it follows that summary judgment in the District Court on the pleadings and affidavits before it was proper.
 
 
 47
 (4) Once again, with the claim that Kirby's counsel wrote Fitzsimmons' report as Referee, there is no evidence whatever in the record substantiating the allegations. Summary judgment for defendants was proper.
 
 
 48
 There are two additional points raised to which we may give brief consideration. First, obviously there is no basis in the record to declare the continued existence of Alleghany against the public interest or to order its dissolution, even if the court in this action were thought to have the power in some manner to accomplish this. Second, although the appellees are undoubtedly correct in their thorough arguments as to the power of federal courts to tax attorneys' fees as costs against unsuccessful plaintiffs in some cases, it would seem clear that the decision whether or not this be done rests within the discretion of the District Court, so far as the case before it was concerned. Cf. Connecticut Importing Co. v. Frankfort Distilleries, 101 F.2d 79, 81 (2 Cir. 1939). In any case, given the nature and proportions of the consequences of the highly questionable conduct of the fiduciaries underlying the long and tortuous course of this litigation, we would not be inclined to penalize the efforts of plaintiffs here to exhaust all possible avenues of relief, in the District Court or on appeal.
 
 
 No. 28397 Alleghany Corporation v. Kirby et al.
 
 
 49
 Robert L. Bobrick (attorney for Smith and Wiener — see Smith v. Fitzsimmons, supra — who are here characterized as "applicants") and Randolph Phillips applied on April 17, 1967 to the original panel in Alleghany v. Kirby and to the court in banc for an order "under Rule 19(c)" directing Smith and Wiener to conduct an investigation to aid this court in determining whether its judgment in Alleghany v. Kirby was procured by fraud. On May 16, 1967 the panel (Judges Moore, Friendly and Kaufman) ordered that the motion be referred to the panel considering the appeal in Smith v. Fitzsimmons.
 
 
 50
 An investigation such as the applicants request would be — applicants hope — preparatory to a motion under Rule 60 (b), F.R.C.P., which provides for relief from a final judgment where fraud has been shown. Rule 19(c) of this court is by now irrelevant, since it merely directs that a motion addressed to a previous decision of the court be referred to the judges rendering the previous decision, and that has been done. If it is not settled in this Circuit that a Rule 60(b) motion should be first made to the Court of Appeals, rather than to the District Court which rendered the judgment, then it is possible that this application for a pre-motion investigation should have been made to the District Court. See the discussion supra. But assuming that the application is properly before the court, we turn to the merits.
 
 
 51
 The basic claim here is that the judgment in Alleghany v. Kirby was procured by fraud, in that alleged fraud connected with Zenn and Breswick was known to various counsel in Alleghany Corp. v. Kirby, who did not report their knowledge to the District Court or this court.
 
 
 52
 There are two separate claims of fraud being made upon this application: (1) that Fitzsimmons had rendered "special services" to the Kirby, etc. interests in Zenn and Breswick, and demanded an additional $25,000 fee (over what Alleghany was ready to pay) on account of those services, that Kirby and Ireland knew of Fitzsimmons' "special interest" in the outcome in Zenn, and that one of Kirby's attorneys on the appeal in Alleghany Corporation v. Kirby knew the facts about Fitzsimmons' fee application but failed to disclose them; and (2) that Alleghany, under Kirby's control, knew that Fitzsimmons' report as Referee in Zenn had been written by Kirby's attorney, Daly.
 
 
 53
 Anticipating the objection that these matters were raised in Smith v. Fitzsimmons (and that, perhaps, the judgment there is res judicata), Bobrick and Phillips state that they have evidence to support their allegations which they were afraid to disclose in the District Court for fear of prejudicing the administration of justice by this court.
 
 
 54
 (1) As to the fee application, the "evidence" adduced breaks into two parts: (a) the admissions of Fitzsimmons and Ireland that they met with respect to the fee application, and the fact that a memorandum submitted by the Donovan firm in Smith v. Fitzsimmons supporting a motion to dismiss the complaint as to Kirby was "signed by no identified member of the bar," but states (contrary to Fitzsimmons' affidavit, it is alleged) that Alleghany's counsel had "proffered" $100,000 for Fitzsimmons' services; and (b) a number of memoranda allegedly written by Phillips as he talked by telephone with Ireland in June 1960, and was informed by Ireland of the progress of the fee application.
 
 
 55
 (a) The fact that Fitzsimmons and Ireland admit having met with respect to the fee, standing alone, means very little if anything. While it can be argued that Fitzsimmons should have limited himself to discussing the fee with Justice McGivern, there is nothing in the fact of the Ireland-Fitzsimmons meeting to indicate that the amount of the fee was determined by the parties rather than by the court. As to the $100,000 allegedly "proffered" by Alleghany, the circumstances seem to be adequately explained by the affidavit of Robert M. Loeffler, a partner in the Donovan firm, submitted in opposition to this application. It appears from that affidavit that Justice McGivern asked Loeffler what he thought a proper fee would be, and that Loeffler, without consulting Alleghany, suggested $100,000; Justice McGivern then consulted Fitzsimmons, who stuck to his $150,000 figure; Ireland subsequently authorized a fee of not more than $125,000, and Justice McGivern approved that figure. If this had all gone on before the Referee's report was submitted, there might well be cause for an investigation, but since the report had long before been submitted, it would seem that the applicants must submit something more in the way of evidence to warrant reopening the matter.
 
 
 56
 (b) Recognizing the need for something more, the applicants have come up with Phillips' three memoranda. The first of these indicates little that is new, except that allegedly Fitzsimmons told Ireland to "throw up a heavy smokescreen," whatever that may mean. The second memorandum is more interesting, for it indicates that Fitzsimmons, in discussing the fee with Ireland, allegedly had said that he wanted to remind Kirby of "special services." The third memorandum indicates that the alleged "special services" consisted of Fitzsimmons' "general perspective toward the whole case," and of the fact that he "fell over backwards" when there were cries for Kirby's testimony; he "strained" to let Kirby off, and "to say the least," took a "very charitable attitude toward the IDS transaction."
 
 
 57
 The applicants realize that these memoranda require corroboration to be of any value, and Phillips states in his affidavit on this application that he was advised by counsel against any public disclosure of the memoranda until corroboration could be obtained. It is now claimed that the memoranda are corroborated by the admissions of Fitzsimmons and Ireland that they met with respect to the fee, by the opinions of Judges Moore and Friendly in Alleghany v. Kirby, both of which recognized (Judge Friendly in considerably stronger terms) that the evidence did not compel the result reached by Fitzsimmons, and by the fact that subsequent to the hearings before Fitzsimmons (in which Kirby was excused from testifying on grounds of illness) Kirby had appeared as a witness in judicial and administrative proceedings. The only possibly significant point among these is the last, and even that loses its impact when it is considered that the hearings before Fitzsimmons took place in 1955, and Kirby's subsequent appearances were in 1960-65.
 
 
 58
 All of the claimed "corroboration" was available before the District Court proceedings in Smith v. Fitzsimmons, yet the Phillips memoranda were not made available to that court. Ireland, in his affidavit on this application, categorically denies the statements attributed to him in the memoranda, and Fitzsimmons, in his affidavit, denies having made any of the statements attributed to him. We find no grounds for reopening, on any such showing, issues once fully litigated.
 
 
 59
 (2) The "evidence" to support the claim that Daly wrote the Referee's report is even less substantial than that supporting the claims of improper conduct surrounding the fee application. The allegation is, specifically, that court reporter Louis G. Schwartz, to whom the Referee's report was dictated, has "informed a member of the bar of this Court" that Daly wrote the report, but has stated that he would deny that he said such a thing if he were taxed with the statement. The "evidence" is a bill submitted by Schwartz to Alleghany under date of July 31, 1956 for services in typing the report. At that time, Alleghany was under the control of Kirby, and was in favor of the settlement. In September 1957, Schwartz called the bill to the attention of David W. Wallace, an Alleghany attorney, who then wrote Schwartz that it would be improper for Alleghany to pay the bill, since the report had not yet been rendered. The claim is, of course, that Schwartz had submitted the bill to those to whom he had rendered the services, and that this indicates that somebody other than Fitzsimmons had dictated the report.
 
 
 60
 Both Fitzsimmons and Daly deny the allegation. Schwartz states that the report was dictated to him by John Mooney, an attorney from Fitzsimmons' office, and that it was in accord with the customary practice of his office in protracted reference proceedings to bill Alleghany during the course of the proceedings before Fitzsimmons (they had billed Alleghany, and were paid by Alleghany, for the transcript of the proceedings). He adds the interesting statement that in June 1966, Phillips told him that the report had been prepared by Daly, and insisted to him that the report must have been dictated by Daly; Schwartz told Phillips that although he had good reason to be angry at Daly, he had no intention of joining in a lie against Daly to say that Daly had dictated the report.
 
 
 61
 At most, the application stands on a porous foundation and in any case our consideration of it is barred by reason of the litigation of the same issues in Smith v. Fitzsimmons and their determination by Judge Bonsal on summary judgment sought by plaintiffs themselves. All the matter put forth in support of the so-called 19(c) motions was or could have been presented to Judge Bonsal and may not be held back and subsequently used as the basis for relitigation of the same issues. The motions must be, and are denied.
 
 
 
 Notes:
 
 
 *
 Of the District Court of Maine, sitting by designation
 
 
 [1]
 Marshall v. Holmes involved a holding that federal courts have jurisdiction to enter orders prohibiting a party from enjoying the benefits of a state court judgment obtained by fraud. The continued validity of that proposition is at least questionable — see Toucey v. New York Life Insurance Co., 314 U.S. 118, 136, 62 S.Ct. 139, 86 L.Ed. 100 (1941) — but any settlement fraud was perpetrated not only on the state court, but also on the United States District Court which vacated the injunction inBreswick, and that fact was enough to give the District Court jurisdiction.
 
 
 [2]
 Appellant lists them as four, but the last three all go to the same basic point
 
 
 [3]
 Appellees also raise questions regarding appellants' status as intervenors and regarding the service of papers. We need not reach these questions